SD:FJN/SK
F.#2018R01812

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF ELECTRONIC DEVICES, CURRENTLY LOCATED IN THE CUSTODY OF THE DRUG ENFORCEMENT ADMINISTRATION | SUPPLEMENTAL APPLICATION FOR A SEARCH WARRANT FOR AN ELECTRONIC DEVICE<br><br>Case No. 20-M-148 |

## SUPPLEMENTAL AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Patrick W. O'Kain, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent with the Drug Enforcement Administration ("DEA").  I have been a DEA Special Agent for approximately 7 years and am currently assigned to the New York Division.  During my tenure with the DEA, I have participated in numerous investigations of money laundering and drug trafficking organizations during which I have conducted physical and electronic surveillance, executed court-authorized search warrants, debriefed cooperating witnesses and victims, reviewed and analyzed numerous taped

conversations of those engaged in illegal activity, monitored wiretapped conversations and reviewed line sheets prepared by wiretap monitors.  Through my training, education and experience, I have become familiar with the manner in which money laundering and drug trafficking schemes are carried out and the efforts of persons involved in each activity to avoid detection by law enforcement.  I have also become familiar with the way that electronic devices, including cellular telephone, computers, and storage devices are used in furtherance of criminal activity.  The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.

3.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

4.      The property to be searched is an Apple iPhone cellular telephone bearing IMEI number 355315086746370 ("Device 1") and an Amazon Fire HD 8 Tablet, Model: SX034QT ("Device 2") (collectively the "Devices").  The Devices are currently located in the custody of the DEA in the Eastern District of New York.

5.      The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

6.      On or about April 10, 2019, the DEA submitted an application for search warrants for the Devices to the Honorable Barbara L, Major, United States Magistrate Judge for the Southern District of California.  *See* 19-MJ-1469 and 19-MJ-1472.  The application included an affidavit in support of the application endorsed by Special Agent Jaquelyn Garcia (the "Garcia Affidavit").  (Exhibit 1).  The application also included search warrants for Judge Major's approval (the "Search Warrants").  (Exhibit 2).

7.      The Garcia Affidavit sought permission to conduct a search of the Devices for electronic evidence of narcotics trafficking by Joanna Dealba ("Dealba") and others.  The Garcia Affidavit then set forth probable cause to search the Devices.  The Garcia Affidavit stated that the identification and extraction of data from Device 1 would be completed within ninety (90) days of the signing of the warrant, absent further application to the Court.  (Ex. A at ¶ 57).  The Garcia Affidavit stated that the identification and extraction of data from Device 2 would be completed within one-hundred twenty (120) days of the signing of the warrant, absent further application to the Court.  Id. at ¶ 66.

8.      On April 10, 2019, at approximately 4:09 p.m. (Pacific Daylight Time), Judge Major signed the Search Warrants.  (See Exhibit 2).  Therefore, per the representations made in the Garcia Affidavit, the identification and extraction of data from Device 1 would be completed by July 9, 2019  The identification and extraction of data from Device 2 would be completed by August 8, 2019.

9.      Upon receiving the search warrants for the Devices, the DEA transferred the Devices to United States Customs and Border Protection ("CBP") in California for data

3

extraction.  Due to technical constraints, CBP was unable to complete the data extraction. The Devices were then transferred to the DEA New York Division.

10.     On or about June 10, 2019, the DEA New York Division sent the Devices to the DEA's forensics laboratory in Lorton, Virginia so that the forensics laboratory could attempt to complete the data extractions authorized by Judge Major.  Because Device 1 is password-protected, the DEA forensics laboratory had to use sophisticated techniques to try to gain access to Device 1.  These techniques can take months to unlock a cellular telephone like Device 1.  Due to backlogs at the forensics laboratory, the attempt to unlock Device 1 did not begin until September 14, 2019.  On or about January 23, 2020, the DEA realized that the time period within which Agent Garcia told Judge Major the data extraction would be completed had expired.  At that point, the DEA forensics laboratory stopped trying to unlock the Device, pending the instant application for a supplemental search warrant.[1]

11.     The DEA forensics laboratory has not made any attempts to extract data from Device 2, pending the instant application for a supplemental search warrant.

12.     Therefore, I respectfully incorporate by reference the contents of the Garcia Affidavit (Exhibit 1) and seek authorization to search the Devices as described in the attached search warrant.  The Devices are currently in the lawful possession of the DEA in the Eastern District of New York.

---

[1]     At the time the DEA stopped trying to unlock Device 1, no data had been extracted from the Device.

13.     In my training and experience, I know that the Devices have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of the DEA.  The prior attempts to unlock Device 1 have not altered its contents in any manner.

## **CONCLUSION**

14.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

S/ Patrick O'Kain

PATRICK W. O'KAIN
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me
on February 13, 2020:

S/ Lois Bloom

HONORABLE LOIS BLOOM
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

# EXHIBIT 1

AO 106 (Rev. 04/10) Application for a Search Warrant



SEALED **UNITED STATES DISTRICT COURT**

for the

Southern District of California

FILED

APR 11 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

One (1) Apple iPhone 7 cellular telephone, IMEI 355315086746370

)
)
)
)
)
)

Case No.

Case No. **19MJ1472**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
   See Attachment A incorporated herein by reference

located in the _____Southern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized):*
   See Attachment B incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Sections 841, 846, 843(b) | Conspiracy to Distribute Controlled Substances |

The application is based on these facts:
   See Attached Affidavit of Special Agent Jaquelyn Garcia incorporated herein by reference

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jaquelyn Garcia, Special Agent DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 4/10/19

_____
*Judge's signature*

City and state:  San Diego, Califonria

Hon. Barbara L. Major, U.S. Magistrate Judge
*Printed name and title*

AO 106 (Rev. 04/10)  Application for a Search Warrant

**SEALED**

## UNITED STATES DISTRICT COURT
### for the
Southern District of California

FILED

APR 11 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

Amazon Fire HD 8 tablet, Model: SX034QT

)
)
)
)
)
)

Case No.

19MJ1469

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A incorporated herein by reference

located in the _____ Southern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. Sections 841, 846, 843(b) | Conspiracy to Distribute Controlled Substances |

The application is based on these facts:
See Attached Affidavit of Special Agent Jaquelyn Garcia incorporated herein by reference

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jaquelyn Garcia, Special Agent DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 4/10/19

_____
*Judge's signature*

City and state:  San Diego, Califonria

Hon. Barbara L. Major, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT OF DEA SPECIAL AGENT JAQUELYN GARCIA

I, Special Agent Jaquelyn Garcia, being first duly sworn, hereby depose and state as follows:

## I.      INTRODUCTION

1.      I make this affidavit in support of an application for a warrant to search:

      a)      Apple iPhone 7 cellular telephone, IMEI 355315086746370;

      b)      Amazon Fire HD 8 tablet, Model: SX034QT;

      c)      Kingston DT50 8GB USB flash drive;

all found and seized on or about February 1, 2019 (hereinafter referred to as "**TARGET DEVICES**" and described in detail in Attachment A). As described below, the **TARGET DEVICES** were seized from JOANNA DEALBA ("DEALBA") during the execution of a border search at the United States port of entry located in San Ysidro, California. The **TARGET DEVICES** are located at 2255 Neils Bohr Court, San Diego, CA 92154.

2.      The statements contained in this affidavit are based on my own investigation, my training and experience as a law enforcement agent, information provided to me by or through other law enforcement agents, investigators and individuals with knowledge of this matter, and through my review of documents related to this investigation. Based upon the information below, it is my opinion that there is probable cause to believe that evidence and instrumentalities of violations of 21 U.S.C. §§ 841, 843(b) and 846, are likely to be found in the **TARGET DEVICES**.

## II.     AGENT BACKGROUND

3.      I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7).  As such, I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

4.      I am a Special Agent employed by the Drug Enforcement Administration

1  ("DEA"), and have been so since May 2018.  I am currently assigned to the San Ysidro

2  Resident Office of the San Diego Field Division.  I am authorized and presently assigned

3  to investigate and enforce violations of the Controlled Substances Act and other

4  violations of federal law.  During my employment with DEA, I received four and one

5  half months of full-time, formalized training at the DEA Basic Agent Training Academy

6  in Quantico, Virginia.  This training included, but was not limited to, drug identification,

7  detection, interdiction, undercover operations, money laundering techniques,

8  transportation, concealment, and sales of narcotics, as well as the investigation of

9  individuals and organizations involved in the smuggling, cultivation, manufacturing, and

10  illicit trafficking of controlled substances, including methamphetamine and heroin.

11      5.      My training and experience is based on my formal training, as well as the

12  knowledge of other Special Agents of the DEA, other federal agencies, and state and

13  local law enforcement officers who are experienced in the field of investigating

14  controlled substance violations.  Additionally, I have had contact with narcotics

15  traffickers and informants and have discussed with them the manufacture, importation,

16  concealment, packaging, sales, use, distribution, and transportation methods utilized by

17  narcotics traffickers and drug trafficking organizations (DTOs).  As a result, I have

18  become familiar with the operations and the various tools, methods, trends,

19  paraphernalia, conveyances, and related articles utilized by various traffickers in their

20  efforts to manufacture, import, conceal, package, sell, use, distribute, and transport

21  narcotics.

22      6.      I have been involved in the execution of narcotics-related search warrants.

23  As a result, I have encountered and become familiar with the various tools, methods,

24  trends, paraphernalia, and related articles used by drug traffickers and trafficking

25  organizations in their efforts to import, conceal, manufacture, and distribute controlled

26  substances.  I have become familiar with the manner in which narcotics traffickers

27  smuggle, transport, store, and distribute narcotics, as well as how they collect and launder

28

AFF. IN SUPPORT OF SEARCH WARRANT
(FILED UNDER SEAL)                                    2

1  drug proceeds.  I am also familiar with the manner in which narcotics traffickers use
2  telephones, cellular telephone technology, coded or slang-filled telephone conversations,
3  false or fictitious identities, and other means to facilitate their illegal activities and thwart
4  law enforcement investigations.

5        7.    I have personally participated in the investigation discussed in this Affidavit.
6  I have also discussed the investigation with other DEA agents and with other law
7  enforcement agencies involved in it.  I have reviewed records and reports relating to the
8  investigation.  Unless otherwise noted, wherever in this Affidavit I assert that a statement
9  was made, the information was provided by another DEA agent, law enforcement officer,
10 or witness who may have had either direct or hearsay knowledge of that statement and to
11 whom I or others have spoken, or whose reports I have reviewed.  Throughout this
12 Affidavit, all sentences that begin with the words "I believe" are based upon such
13 information as well as my training and experience and consultation with other agents.
14 Since this affidavit is submitted for the limited purpose of setting forth probable cause for
15 the requested search warrant, I have not included each and every fact known to me
16 concerning this investigation.

17 III.    PROBABLE CAUSE

18       **A.    Background Regarding Digital Currency and the Dark Web**

19       8.    Digital currency (also known as crypto-currency) is generally defined as an
20 electronic-sourced unit of value that can be used as a substitute for fiat currency (i.e.
21 currency created and regulated by a government).  Digital currency exists entirely on the
22 internet and is not stored in any physical form.  Digital currency is not issued by any
23 government, bank, or company and is instead generated and controlled through computer
24 software operating on a decentralized peer-to-peer network.  Digital currency is not
25 illegal in the United States and may be used for legitimate financial transactions.
26 However, digital currency is often used for conducting illegal transactions, such as the
27 sale of controlled substances.

28

AFF. IN SUPPORT OF SEARCH WARRANT
(FILED UNDER SEAL)         3

9.     Bitcoin is a type of digital currency.  Bitcoin payments are recorded in a public ledger called a blockchain that is maintained by peer-to-peer verification and is thus not maintained by a single administrator or entity.  Individuals can acquire Bitcoins either by "mining" or by purchasing Bitcoins from other individuals.  An individual can "mine" for Bitcoins by allowing his/her computing power to verify and record the Bitcoin payments on the blockchain.  Individuals are rewarded for this by being given newly created Bitcoins.

10.     An individual can send and receive Bitcoins through peer-to-peer digital transactions or by using a third-party broker.  Such transactions can be done on any type of computer, including laptop computers, tablets, and cellular telephones.

11.     Bitcoins can be stored in "wallets".  A digital wallet essentially stores the access code that allows an individual to conduct Bitcoin transactions on the public ledger. To access Bitcoins on the public ledger, an individual must use a public address (or "public key") and a private address (or "private key").  The public address can be analogized to an account number while the private key is like the password to access that account.

12.     Even though the public addresses of those engaging in Bitcoin transactions are recorded on the blockchain, the true identities of the individuals or entities behind the public addresses are not recorded.  If, however, a real individual or entity is linked to a public address, it would be possible to determine what transactions were conducted by that individual or entity.

13.     Through the dark web or darknet – websites accessible only through encrypted means – individuals have established online marketplaces, such as Silk Road, AlphaBay, DreamMarket, Wall Street Market, Point/Tochka, and Berlusconi, for narcotics and other illegal items.  These markets often only accept payment through digital currencies, such as Bitcoin.  Accordingly, individuals intending to purchase illegal items on the dark web need to obtain Bitcoins.  Conversely, individuals who have

1  received Bitcoin as proceeds of illegal sales on the dark web need to sell their Bitcoin or

2  convert them to fiat currency in order to spend the proceeds outside of the dark web.

3  Such sales or exchanges of Bitcoin are often facilitated by peer-to-peer Bitcoin

4  exchangers who advertise their services on website designed to facilitate such

5  transactions.

6        14.    Dark web sites such as Silk Road, AlphaBay, DreamMarket, Wall Street

7  Market, Point/Tochka, and Berlusconi operate(d) on "The Onion Router" or "TOR"

8  network.  The TOR network is a special network of computers on the internet that is

9  designed to conceal the true Internet Protocol ("IP") addresses of the computers accessing

10  the network, and, thereby, the locations and identities of the network's users.  TOR

11  likewise enables websites to operate on the network in a way that conceals the true IP

12  addresses of the computer servers hosting the websites, which are referred to as "hidden

13  services" on the TOR network.  Such "hidden services" have complex web addresses,

14  which are many times generated by a computer algorithm, ending in ".onion" and can

15  only be access through specific web browser software designed to access the TOR

16  network.

17      **B.**    **The DEA Identifies "RAPTURERELOADED" as a Dark Web**
               **Narcotics Distributor**

18

19        15.    In 2018, the DEA began investigating narcotics traffickers operating on the

20  dark web.  The DEA identified narcotics vendors and contacted those vendors using

21  various methods.  One of the vendors identified by the DEA was

22  "RAPTURERELOADED," who advertised on Wall Street Market.  According to

23  information obtained from RAPTURERELOADED's profile on Wall Street Market,

24  RAPTURERELOADED was a United States-based seller of heroin and

25  methamphetamine since June 2018.

26        16.    RAPTURERELOADED's listings page stated, "Reporting from Baja, CA,

27  AZ, and NY!  Have you ever paid attention to where your product is coming from other

28

AFF. IN SUPPORT OF SEARCH WARRANT
(FILED UNDER SEAL)           5

than the purpose of shipping time?  Allow us to put things into perspective for a sec.
Colombian cocaine, California's chronic, and Cuba's cigars wouldn't be notorious if not
for their quality.  We stand behind our products so much that we decided to centralize
near the sources last year."

17.  RAPTURERELOADED's listings page also claimed that it tracked all
orders, "We also track every order for yours (and ours) piece [sic] of mind!  For those of
you that use informed delivery, this service that we pay for uses the same system to scan
your package.  This barcode provides us with tracking information as your packages are
scanned at each postal facility.  We check on your orders every day and if we catch
something ahead of time we will contact you.  What does this mean for you?  Free 1st
class shipping with real tracking free of charge!!!"  RAPTURERELOADED then offered
a variety of "stealth" delivery options, including options designed to thwart "controlled
deliveries."

18.  As of on or about October 3, 2018, RAPTURERELOADED had completed
167 transactions on Wall Street Market and held a Vendor Level of 9 with 113,000
experience points.  As of on or about January 8, 2019, RAPTURERELOADED had
completed 380 transactions on Wall Street Market and held a Vendor Level of 11 with
346,000 experience points.  Wall Street Market bases its level system on experience
points, which are obtained through successful transactions, positive reviews, and the
recruitment of new users.  Vendor Levels, in turn, are based on the amount of experience
points accrued.  This means that in the approximately 3-month period between October
and January 2018, RAPTURERELOADED completed approximately 213 orders, raised
the Vendor Level by 2, and gained approximately 179,000 experience points.

**C.    Undercover Narcotics Purchase on October 3, 2018**

19.  On or about October 3, 2018, a DEA Special Agent acting in an undercover
capacity ("UC"), went to RAPTURERELOADED's listings on Wall Street Market and
purchased 10 grams of heroin for a total of $510 ($500 for the heroin and $10 for

shipping).  Per RAPTURERELOADED's instructions on his/her listings, the UC provided a shipment address in Queens, New York for the heroin.  Upon entering the order for 7 grams of heroin, the UC was given an identification number for the transaction and a trade address where Bitcoin should be sent as payment.  The UC was also told a price in Bitcoin based on the exchange rate at the time of the purchase.  The UC then sent the Bitcoin to RAPTURERELOADED via the escrow function on Wall Street Market, as requested.

20.     On or about October 4, 2018, RAPTURERELOADED marked the heroin as shipped.  On or about October 11, 2018, the UC sent a message to RAPTURERELOADED via Wall Street Market stating, "Hey Rapture I have not received anything yet.  Was it sent out?  Do you have a tracking #?"  On or about October 12, 2018, RAPTURERELOADED sent a message to the UC via Wall Street Market, stating "Your order is out for delivery 10/12/18.  If you wish to reorder with us please allow up to 10 business days for delivery.  Thank you. –RR".  RAPTURERELOADED also sent the UC a tracking number for the package from a third-party private parcel tracking service (hereinafter referred to as "Company A".

21.     On or about October 18, 2018, the UC retrieved the package that RAPTURERELOADED sent to the UC's mailbox in Queens, New York.  The package had a return address of "R&R Inc., 1201 Vine Street, Los Angeles, CA 90036".  The package also bore a postmark from San Diego, California dated October 9, 2018.  A search of the package revealed a bag that contained approximately 10 grams of suspected heroin.[1]

### D.     Undercover Narcotics Purchases on January 3, 2019

22.     On or about January 3, 2019, the UC went to RAPTURERELOADED's

---

[1] Per DEA policy, suspected heroin is not permitted to be field tested due to the potential hazards of heroin being mixed with fentanyl. Based on my training and experience, I believe the substance is heroin based on its appearance. The suspected heroin has been submitted for laboratory testing and the results are pending.

1    listings on Wall Street Market and purchased 30 grams of heroin for a total of $1,810

2    ($1,800 for the heroin and $10 for shipping).  Per RAPTURERELOADED's instructions

3    on his/her listings, the UC provided a shipment address in Queens, New York for the

4    heroin.  Upon entering the order for 30 grams of heroin, the UC was given an

5    identification number for the transaction and a trade address where Bitcoin should be sent

6    as payment.  The UC was also told a price in Bitcoin based on the exchange rate at the

7    time of the purchase.  The UC then sent Bitcoin to RAPTURERELOADED via the

8    escrow function on Wall Street Market, as requested.

9         23.    Later in the day on or about January 3, 2019, the UC went to

10   RAPTURERELOADED's listings on Wall Street Market and purchased 10 grams of

11   methamphetamine for a total of $160 ($150 for the methamphetamine and $10 for

12   shipping).  Per RAPTURERELOADED's instructions on his/her listings, the UC

13   provided a shipment address in Queens, New York for the heroin.  Upon entering the

14   order for 10 grams of methamphetamine, the UC was given an identification number for

15   the transaction and a trade address where Bitcoin should be sent as payment.  The UC

16   was also told a price in Bitcoin based on the exchange rate at the time of the purchase.

17   The UC then sent Bitcoin to RAPTURERELOADED via the escrow function on Wall

18   Street Market, as requested.

19        24.    On or about January 14, 2019, the UC retrieved the package that

20   RAPTURERELOADED sent to the UC's mailbox in Queens, New York.  The package

21   had a return address of "Wallsteen Market Inc." at 1600 North Arizona Avenue, San

22   Hacienda Chandler, AZ 85225.  The package also bore a postmark with a tracking

23   number.  According to the tracking number transit history, the parcel originated at a

24   United States Postal Service facility in San Diego, California on or about January 9,

25   2019.  A search of the package revealed a small plastic container that contained

26   approximately 30 grams of suspected heroin.[2]  The package also contained a clear plastic

27

28        [2] Based on my training and experience, I believe the substance is heroin based on its appearance.

AFF. IN SUPPORT OF SEARCH WARRANT
(FILED UNDER SEAL)                                8

1   bag that contained a substance that tested positive for methamphetamine.

2           **E.**    **Undercover Narcotics Purchases on January 22, 2019**

3         25.    On or about January 22, 2019, the UC went to RAPTURERELOADED's

4   listings on Wall Street Market and purchased 20 grams of heroin for a total of $310 ($300

5   for the heroin and $10 for shipping).  Per RAPTURERELOADED's instructions on

6   his/her listings, the UC provided a shipment address in Queens, New York for the heroin.

7   Upon entering the order for 20 grams of heroin, the UC was given an identification

8   number for the transaction and a trade address where Bitcoin should be sent as payment.

9   The UC was also told a price in Bitcoin based on the exchange rate at the time of the

10  purchase.  The UC then sent Bitcoin to RAPTURERELOADED via the escrow function

11  on Wall Street Market, as requested.

12        26.    As of the date of this application, the heroin has not yet been received by the

13  UC.[3]

14          **F.**    **The DEA Identifies RAPTURERELOADED as JOANNA DEALBA**

15        27.    As explained above, RAPTURERELOADED provided the UC with a

16  tracking number from Company A for the heroin that the UC purchased on or about

17  October 3, 2018.  According to Company A's website, Company A is a paid service that

18  allows users to track items shipped via regular first-class United States mail.  Company A

19  sells United States Postal Service-intelligent barcodes that a shipper can add to a piece of

20  regular first-class U.S. mail that allows the mail piece to be tracked as it travels through

21

22  _____

    The suspected heroin has been submitted for laboratory testing and the results are pending.

23      [3] As described in detail below, the person who the DEA believes to be RAPTURE RELOADED,

24  was detained at the San Ysidro Port of Entry on or about January 31, 2019 and questioned about several
    parcels containing drugs that were addressed to her husband and intercepted by law enforcement.  I

25  believe that this border stop temporarily disrupted RAPTURERELOADED's drug trafficking operation
    and was the reason the DEA agents never received the 20 grams of heroin. On or about February 6,

26  2018, DEA agents, acting in an undercover capacity, sent an email to RAPTURERELOADED at
    raptureroom@protonmail.com and inquired about the shipment.  RAPTURERELOADED responded

27  that the organization ran into technical difficulties, provided a new email address, and informed the
    agents that they were discontinuing use of the raptureroom@protonmail.com account.

28

1  the postal system to its destination.

2        28.    Using Company A's tracking system, DEA agents learned that the package

3  containing the heroin that was purchased on October 3, 2018, was shipped by Company

4  A User ID 1732, which is registered to R&R, Inc., 114 C Avenue, Coronado, California

5  92118 (the "Coronado Address"). According to open source and public record research,

6  this address appears to be an apartment building with several retail storefronts. The phone

7  number associated with R&R was 619-934-9016 (the "9016 Number"). The sender of

8  the package purchased 250 shipment tracking barcodes from Company A on or about

9  July 27, 2018 using a credit card in the name of DEALBA. Subpoena results for the

10  9016 Number indicate that the subscriber is "Revolve Laundry" with a billing address of

11  2675 Customhouse Court, Suite K, San Diego, CA 92154.[4]  However, a review of public

12  record databases revealed that the 9016 Number associated with the package is associated

13  with DEALBA at 1332 La Tempra Corte, Chula Vista, California. A review of

14  California motor vehicle records revealed that DEALBA resides at 1332 La Tempra

15  Corte, Chula Vista, California.

16        29.    A further review of Company A records revealed four other accounts -- in

17  addition to the 1732 account used for the October heroin shipment -- that are associated

18  with DEALBA:

| User ID | Name | Company Name | Address | Phone Number | Email |
|---|---|---|---|---|---|
| 1732 | R&R, Inc. | WSM | Coronado Address | 9016 Number | brandocommando619@yahoo.com |
| 1719 | R&R, Inc. | | Coronado Address | 619-576-2337 | jojojomojoso@my.com |
| 1718 | R&R, Inc. | R&R, Inc. | Coronado Address | 9016 Number | lyftyourlyfe@my.com |
| 1713 | B. Unangst | R&R, Inc. | Coronado Address | 619-344-9553 | rapturereloaded@protonmail.com |
| 1705 | Brandon Unangst | Rapture | Coronado Address | 619-576-2337 | raptureroom@protonmail.com |

---

[4] Revolve Laundry appears to be a commercial laundry business. The connection between
DEALBA and Revolve Laundry is under investigation.

1      30.    According to Company A, all five of the accounts were created in or about

2  July 2018, which is shortly after the RAPTURERELOADED account was created on

3  Wall Street Market.  As discussed above, the 1732 account that was used for the October

4  heroin shipment was funded with a credit card in the name of DEALBA.  The 1705

5  account was funded using a credit card bearing the same number, expiration date, and

6  card verification value ("CVV").  However, the card was in the name of Brandon

7  Unangst ("Unangst").  Based on my training and experience, I believe that the two credit

8  cards shared numbers, expiration dates, and CVVs because they were both from the same

9  account.

10      31.    A review of public records and open source social media accounts revealed

11  that Unangst was married to DEALBA from in or about April 2017 until Unangst's death

12  on or about March 6, 2018.[5]

13      32.    Since Unangst's death, DEALBA has been utilizing his identity and credit

14  cards – in addition to her own – to fund her narcotics business on Wall Street Market.

15  For example, as explained above, DEALBA used her credit card and Unangst's credit

16  card to create and fund the Company A accounts in July 2018 – approximately four

17  months after Unangst's death.  Moreover, each account bears a connection to DEALBA

18  and/or Unangst:

19    • Account 1732 bears DEALBA's cellular telephone number and an email in the
20      name of brandocommando619@yahoo.com, which based on my training and
21      experience is likely an email associated with Brandon Unangst.

22    • Account 1719 bears an email in the name of jojojomojoso@my.com.  A review of
23      DEALBA's Facebook page lists "jojojomojososope" as a nickname for DEALBA.
       A user named "jojo mojo le dope" maintains a YouTube account that contains a
24      profile picture that is similar to the logo used by RAPTURERELOADED on Wall
25      Street Market.  Specifically, both accounts use a reversed capital R beside a normal

---

26       [5]    On or about March 16, 2018, DEALBA posted on Facebook that Unangst had "passed

27  last Tuesday peacefully in our home."  In the post, DEALBA also refers to herself as Unangst's "Y-fee,"
    which based on my training and experience is slang for "wifey" or wife.

28

AFF. IN SUPPORT OF SEARCH WARRANT
(FILED UNDER SEAL)          11

capital R, visually similar to ЯR, inside a five-pointed star. The YouTube account contains a video titled, "Newlyweds getting goofy!" and shows an unidentified male and female. I have reviewed the images of the male in the video and compared them to Unangst's California driver license photo and believe they are the same person. I have also reviewed the images of the female in the video and compared them to DEALBA's California driver license photo and believe they are the same person.

- Account 1718 bears DEALBA's cellular telephone number, and an email in the name of lyftyourlyfe@my.com. A review of DEALBA's Facebook page revealed that DEALBA lists her occupation to be "independent contractor" for the ride-sharing company Lyft.

- Account 1713 bears Unangst's name and an email in the name of rapturereloaded@protonmail.com.

- Account 1705 bears Unangst's name and an email in the name of raptureroom@protonmail.com.

### G.   Narcotics Seizures

33.    On or about August 12, 2018, United States Customs and Border Protection ("CBP") intercepted a package from the Netherlands that was addressed to Unangst at the Coronado Address. The package contained approximately 30 grams of a brownish crystal-like powder that field tested positive for methamphetamine. Unangst had been dead for approximately five months at the time the package was intercepted.

34.    On or about September 30, 2018, CBP intercepted a package from the Netherlands that was addressed to Unangst at 482 W San Ysidro Blvd, Apartment 1571, San Ysidro, California (the "San Ysidro Address").[6] The package contained approximately 52 tablets that tested positive for methamphetamine. Unangst had been dead for approximately seven months at the time the package was intercepted.

35.    On or about November 6, 2018, CBP intercepted a package from the

---

[6] 482 W San Ysidro Blvd, Apartment 1571, San Ysidro, California is the address for a company that provides mailbox rental services. DEALBA admitted to law enforcement during the border stop described herein that she maintained P.O. Box 1571 at this location.

1  Netherlands that was addressed to Unangst at the San Ysidro Address. The package

2  contained approximately 207 pills that tested positive for methamphetamine. Unangst

3  had been dead for approximately eight months at the time the package was intercepted.

4      36.    On or about January 3, 2019, the Department of Homeland Security,

5  Homeland Security Investigations ("HSI") intercepted a package from Canada that was

6  addressed to Unangst at the San Ysidro Address. The package contained approximately

7  4.2 grams of a substance that tested positive for fentanyl. Unangst had been dead for

8  approximately 10 months at the time the package was intercepted.

9      37.    On or about January 14, 2019, CBP intercepted a package from the

10  Netherlands that was addressed to Unangst at the San Ysidro Address. The package

11  contained approximately 239.23 grams of a substance (in tablet form) that tested positive

12  for methamphetamine. Unangst had been dead for approximately 10 months at the time

13  the package was intercepted.

14      **H.**    **Seizure of the TARGET DEVICES**

15      38.    A review of records maintained by United States Customs and Border

16  Protection ("CBP") revealed that DEALBA has made at least 184 crossings at the border

17  between San Ysidro, California and Tijuana, Mexico between December 25, 2008 and

18  December 27, 2018. Furthermore, DEALBA made those crossings in at least five

19  different vehicles.

20      39.    On or about January 31, 2019, DEALBA attempted to enter the United

21  States from Mexico at the port of entry located in San Ysidro, California. DEALBA was

22  driving a Dodge conversion van. CBP officers referred DEALBA to secondary

23  inspection. DEALBA had in her possession the **TARGET DEVICES**, which she

24  claimed to own. A search of the vehicle revealed four unmarked bottles containing a

25  clear liquid in a backpack behind the front passenger seat of the vehicle.[7]

26

27      [7] A field test of the liquid resulted in a positive indication for the presence of Poly(propylene-co-ethylene), an industrial chemical with many industrial and medical applications. One of the applications, according to the National Institute of Health, is as a "release vehicle for percutaneous administration of

28

40.     Law enforcement officers conducted a voluntary interview of DEALBA. DEALBA told the interviewing agents that she and her husband, Unangst, received mail at a post office box located at the San Ysidro Address. DEALBA stated that Unangst had died around the holidays in November 2018. DEALBA later stated that Unangst died in December 2018. DEALBA was unable to provide the circumstances of his death and claimed that Unangst's body was found in their kitchen by a neighbor, who called for help and unspecified people took him.

41.     DEALBA stated during the interview that that she was planning to pick up a package containing pedals for a scooter from the San Ysidro Address. At this time, the interviewing agents informed DEALBA that several packages addressed to Unangst at the San Ysidro Address contained controlled substances that were seized by law enforcement. DEALBA stated that Unangst ordered the packages prior to his death and denied any knowledge of the packages or their contents.

42.     At this point, the interview was paused and DEALBA was read her <u>Miranda</u> rights. DEALBA waived her rights and stated that she suspected her husband used narcotics but did not know for sure. DEALBA then contradicted her original claim that the **TARGET DEVICES** belonged to her and stated that the Apple iPhone belonged to her cousin, and that she was in possession of it in order to get it activated for her use. The interviewing agents noted that the Apple iPhone was already active and receiving text messages. DEALBA claimed that the Amazon Fire HD 8 tablet was owned by Unangst. When the interviewing agents highlighted the inconsistencies in her story, DEALBA asked for a lawyer and the agents terminated the interview.

**I.     Preliminary Border Search of the TARGET DEVICES**

43.     Pursuant to a border search, HSI detained the **TARGET DEVICES** for data extraction. Following the interview, DEALBA and her vehicle were subsequently

---

fentanyl in vitro and in vivo". DEALBA claimed that she believed the liquid to be contact lens solution, and voluntarily completed a CBP Abandonment Form, relinquishing custody of the substance.

AFF. IN SUPPORT OF SEARCH WARRANT
(FILED UNDER SEAL)                                    14

released into the United States.

44.    Due to time constraints, HSI was unable to conduct a complete forensic analysis on the **TARGET DEVICES**.  However, a preliminary search of the Apple iPhone revealed associated telephone numbers, Apple ID account information, and the Google search history. The USB device and tablet were not searched.

45.    According to the preliminary extraction on the Apple iPhone, the associated telephone number is 619-763-3032, and the associated Apple ID email addresses are: joanna.dealba@yahoo.com, joannadealba@rocketmail.com, jojomojosodope@icloud.com, rapturereloaded@gmail.com, brandocommando6969@gmail.com, jojomojosodope11@gmail.com, and mzcherrywine@gmail.com.

46.    Several of these email addresses are significant in that the prefixes are similar to those of the email addresses registered with the Company A accounts used to send drugs; specifically, "jojomojoso", "rapturereloaded" (also the name of DEALBA's dark net vendor account), and "brandocommando".

47.    Additionally, during the secondary inspection interview, DEALBA provided the interviewing agents with lyftyourlife@my.com, as a point of contact for her.[8]

48.    The preliminary forensic extraction also revealed DEALBA's Google search history from approximately late 2017 until late December 2018.  Several of her searched terms and phrases are significant, as I believe they apply to her dark web drug trafficking operation.

49.    For example on or about January 21, 2018, DEALBA searched for "oxycontin marketing".  On or about January 21, 2018, DEALBA searched "fentanil precio mexico talnur"[9]; and on January 24, 2018 she searched "butyrfentanyl vendors".

---

[8] lyftyourlife@my.com is the email address that was used for Company A account number 1718 in conjunction with the 9016 Number.

[9] This is Spanish for the phrase "Fentanyl prices Mexico".  I do not know what the word "talnur" signifies in Spanish or English.

AFF. IN SUPPORT OF SEARCH WARRANT
(FILED UNDER SEAL)                              15

1  Additionally, several of DEALBA's searches involve dissolving drugs in liquid. For

2  example, on or about December 15, 2018, DEALBA searched: "how to convert a 10mg

3  pill in fluid" and on February 4, 2018, she searched "butyryl furanylfentanyl how to

4  disolve [sic] powder".

5       50.    Additionally, I believe that several of DEALBA's searches applied to

6  shipping and mailing of drugs.  For example, on or about August 23, 2018, DEALBA

7  searched "canada [sic] bubble mailer standard usps [sic] price" and "USPS international

8  shipping calculator".  As another example, on February 8, 2018, DEALBA searched

9  "how many stamps needed for domestic us to us for 20.3grams".

10       51.    Furthermore, I believe that several of DEALBA's searches apply to

11  cryptocurrencies and dark net markets.  For example, on or about January 12, 2018,

12  DEALBA searched "rapture images avatar"[10]  As another example, on or about August 1,

13  2018, DEALBA searched "how much is 5.2 monero".[11]  And on or about September 1,

14  2018, she searched "tip jar thank you".[12]

15       52.    Based on the above, I respectfully submit that there is probable cause that

16  DEALBA was operating the RAPTURERELOADED page on Wall Street Market to

17  distribute narcotics.  Moreover, based on the information later learned from the

18  undercover purchases, Company A data, drug seizures, DEALBA's statements, and the

19  partial data extraction from the Apple iPhone, there is probable cause to believe that

20  DEALBA was using the Apple iPhone in furtherance of her narcotics distribution

21  business.  Based on my training and experience, I know that information related to

22  narcotics trafficking can be stored on devices such as the Apple iPhone, the Amazon Fire

23

24       [10] I believe DEALBA was searching for "rapture" images to build the logo for her dark net drug

25  distribution operation.

26       [11] Monero is a cryptocurrency that is often accepted as payment on dark net marketplaces. It is
often cited as being more private and difficult to trace than Bitcoin.

27       [12] A "tip jar" is a separate cryptocurrency wallet address for vendors on dark net markets, in

28  which satisfied customers can deposit a tip.

AFF. IN SUPPORT OF SEARCH WARRANT
(FILED UNDER SEAL)          16

1  HD table, and the Kingston DT50 USB flash drive.  The Amazon HD Fire tablet is

2  another device that can be used to access the same items as the Apple iPhone, including

3  the email addresses and dark web websites described herein, including Wall Street

4  Market.  Additionally, based on my training and experience, individuals who access the

5  dark web and use Bitcoin can use flash drives such as the Kingston DT50 to carry

6  encryption keys and other data files necessary to access the dark web and Bitcoin

7  accounts. Based on the fact that the Amazon HD Fire and the Kingston DT50 were

8  collocated with the Apple iPhone, there is probable cause to believe all of the TARGET

9  DEVICES were used in furtherance of DEALBA's dark web drug vending operation.

10 **IV.    GENERAL KNOWLEDGE REGARDING DRUG TRAFFICKING**

11         53.    Based on my training, experience, and participation in this and other

12 narcotics trafficking investigations and upon my consultation with other experienced law

13 enforcement officers, I have learned the following information regarding individuals,

14 involved in drug trafficking:

15                a.     Drug trafficking is a business that involves numerous co-conspirators,

16 from lower-level dealers to higher-level suppliers, as well as associates to process,

17 package and deliver the drugs and persons to launder the drug proceeds.  These persons

18 frequently maintain listings of names, aliases, telephone numbers, pager numbers,

19 facsimile numbers, physical addresses, and email addresses, sometimes encoded and

20 sometimes not encoded, for the purpose of contacting their suppliers, customers,

21 transporters, and others involved in their illicit drug distribution activities.  These records

22 are typically maintained on their person or in their residences, stash houses, and/or

23 vehicles, so they are readily available in order to efficiently conduct their drug trafficking

24 business.  Moreover, such records are often stored electronically within the memory of

25 cellular telephones, computers, tablets, personal digital assistants, or flash drives such as

26 the **TARGET DEVICES**;

27                b.     Drug traffickers often use cellular telephones, text messaging devices,

28

AFF. IN SUPPORT OF SEARCH WARRANT
(FILED UNDER SEAL)                    17

1  computers, email, and/or personal digital assistants such as iPhone and tablet devices in
2  order to communicate with their suppliers, customers, transporters, and others involved in
3  their illicit drug distribution activities.  Drug traffickers often keep these items on their
4  person or in their residences, stash houses, businesses, and/or vehicles where they are
5  readily available.

6          c.      Drug traffickers often use cellular telephones to receive and/or send
7  telephone calls to their sources and customers as well as to communicate with criminal
8  associates.  I know that a review of the voice mail messages, including voice mail
9  greetings, and electronic data stored within cellular telephones may result in the
10 identification of the trafficker using the telephone, of previously unidentified co-
11 conspirators, and locations utilized by co-conspirators in the furtherance of illegal
12 activities.

13         d.      Drug traffickers also use cellular telephones to send and receive text
14 messages and email messages, and such messages are often stored on such phones.  I
15 know that a review of the text and email messages may result in the identification of the
16 trafficker using the telephone, of previously unidentified co-conspirators, and locations
17 utilized by co-conspirators in the furtherance of illegal activities.

18         e.      Electronically stored data includes, but is not limited to, the assigned
19 cellular telephone number, names and/or nicknames and associated telephone numbers,
20 dates and times of recent call activity, text messages, photographs, and videos.  Based on
21 my training and experience, I believe that a review of this stored electronic data will
22 provide evidence relevant to the drug trafficking charges at issue.

23         f.      Many cellular telephones have the capability of taking and storing still
24 photographs as well as recording and storing videos.  Drug traffickers often take pictures
25 and/or videos of their product, proceeds, etc.

26         g.      Drug traffickers keep books, receipts, notes, ledgers and other forms
27 of records specifically relating to their drug distribution activities on their cellular

28

1  telephones.  Because drug traffickers often "front" drugs to their customers – that is, sell

2  the drugs on credit – or receive drugs from their suppliers on credit, such documentation

3  is necessary to keep track of the amounts paid and owed with respect to their customers

4  and suppliers.  These ledgers are more commonly known as "pay/owe sheets" and may

5  be as simple as notations in the phone or may be recorded more formally in spreadsheets,

6  and are frequently encoded in order to protect those involved.

7           h.        Drug trafficking is a cash business.  Customers pay for drugs with

8  cash and dealers commonly purchase drugs from their suppliers with cash.  When drug

9  traffickers amass wealth, they often attempt to legitimize that wealth or otherwise conceal

10  it and its origin from discovery by law enforcement.  To accomplish this, drug traffickers

11  often use different techniques, including the use of foreign and domestic banks and their

12  attendant services, including savings and checking accounts, securities, cashier's checks,

13  money drafts and letters of credit to exchange drug proceeds into money that appears to

14  come from a legitimate source.  Drug traffickers also purchase real estate or vehicles, and

15  establish shell corporations and business fronts that they use to launder drug proceeds.

16  Drug traffickers often utilize fictitious or "straw-holder" owners to conceal the true

17  ownership, vehicles, or other valuable items purchased with the proceeds of illicit drug

18  sales.  In addition, drug traffickers often use wire transfers, cashier's checks, and money

19  orders to pay for drugs or other costs relating to their distribution business.  Drug

20  traffickers often keep records relating to these activities on their cellular phones.

21           i.        Drug traffickers often use the United States Postal Service or

22  commercial express mail delivery companies, such as FedEx or UPS, to ship drugs and

23  money to various points within the United States.  They do so, at least in part, due to the

24  convenience of the service and the availability of related internet and phone tracking

25  services, speed of delivery, and to reduce their risk of arrest during the transportation of

26  drugs from one place to another.  They often use hand-written airbills, drop the packages

27  near closing time, pay for such services in cash and utilize false or nominee names,

28

addresses, and/or telephone numbers when using such services in order to further insulate themselves from detection by law enforcement.  Drug traffickers frequently maintain records relating to their use of these services, such as receipts, copies of airbills, tracking records, and the like, on their cellular phones.

        j.    Drug traffickers' cellular phones will often contain evidence of the identity of the user of the phone, in the form of photographs, records, or other indicia.

        k.    Drug traffickers frequently maintain multiple cell phones in order to thwart law enforcement's attempts to monitor their phone activities via wiretaps or toll records.

    54.    Additionally, based upon my training, education, and experience investigating these conspiracies, I have learned that searches of cellular/mobile telephones yields evidence:

        a.    tending to identify attempts to import or distribute controlled substances;

        b.    tending to identify accounts, facilities, storage devices, and/or services – such as email addresses, IP addresses, and phone numbers – used to facilitate the importation or distribution of controlled substances;

        c.    tending to identify co-conspirators, criminal associates, or others involved in the importation or distribution of controlled substances;

        d.    tending to identify travel to or presence at locations involved in the importation or distribution of controlled substances;

        e.    tending to identify the user of, or persons with control over or access to, the subject telephone; and/or

        f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## V.   METHODOLOGY FOR CELL PHONE SEARCH

55.   It is not possible to determine, merely by knowing the cellular/mobile telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular/mobile devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular/mobile service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular/mobile telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular/mobile telephone models using forensic hardware and software.  Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

56.   Following the issuance of this warrant, I will collect the cell phone and subject it to analysis. All forensic analysis of the data contained within the cell phone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

57.     Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## VI.     METHODOLOGY FOR TABLET AND USB DRIVE SEARCH

61.     A forensic image is an exact physical copy of the hard drive or other media. A forensic image captures all the data on the hard drive or other media without the data being viewed and without changing the data.  Absent unusual circumstances, it is essential that a forensic image be obtained prior to conducting any search of the data for information subject to seizure pursuant to this warrant.   It can take several hours to image a single hard drive - the bigger the drive, the longer it takes.  As additional devices and hard drives are added, the length of time that the agents must remain onsite can become dangerous and impractical.

62.     After obtaining a forensic image, the data will be analyzed to identify and extract data subject to seizure pursuant to this warrant.  Analysis of the data following the creation of the forensic image can be a highly technical process requiring specific expertise, equipment and software. There are thousands of different hardware items and software programs, and different versions of the same programs, that can be commercially purchased, installed, and custom-configured on a user's computer system. Computers are easily customized by their users.  Even apparently identical computers in an office or home environment can be different with respect to configuration, including permissions and access rights, passwords, data storage, and security.  It is not unusual for a computer forensic examiner to have to obtain specialized hardware or software, and train with it, in order to view and analyze imaged data.

63.     Analyzing the contents of a computer or other electronic storage device, even without significant technical challenges, can be very challenging.  Searching by

keywords, for example, often yields many thousands of hits, each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant hit does not end the review process for several reasons. The computer may have stored metadata and other information about a relevant electronic record – e.g., who created it, when and how it was created or downloaded or copied, when it was last accessed, when it was last modified, when it was last printed, and when it was deleted. Keyword searches may also fail to discover relevant electronic records, depending on how the records were created, stored, or used. For example, keywords search text, but many common electronic mail, database, and spreadsheet applications do not store data as searchable text. Instead, the data is saved in a proprietary non-text format. Documents printed by the computer, even if the document was never saved to the hard drive, are recoverable by forensic programs because the printed document is stored as a graphic image. Graphic images, unlike text, are not subject to keyword searches. Similarly, faxes sent to the computer are stored as graphic images and not as text. In addition, a particular relevant piece of data does not exist in a vacuum. To determine who created, modified, copied, downloaded, transferred, communicated about, deleted, or printed the data requires a search of other events that occurred on the computer in the time periods surrounding activity regarding the relevant data. Information about which user had logged in, whether users share passwords, whether the computer was connected to other computers or networks, and whether the user accessed or used other programs or services in the time period surrounding events with the relevant data can help determine who was sitting at the keyboard.

64.     It is often difficult or impossible to determine the identity of the person using the computer when incriminating data has been created, modified, accessed, deleted, printed, copied, uploaded, or downloaded solely by reviewing the incriminating data. Computers generate substantial information about data and about users that generally is not visible to users. Computer-generated data, including registry

1   information, computer logs, user profiles and passwords, web-browsing history, cookies

2   and application and operating system metadata, often provides evidence of who was

3   using the computer at a relevant time.  In addition, evidence such as electronic mail, chat

4   sessions, photographs and videos, calendars and address books stored on the computer

5   may identify the user at a particular, relevant time.  The manner in which the user has

6   structured and named files, run or accessed particular applications, and created or

7   accessed other, non-incriminating files or documents, may serve to identify a particular

8   user.  For example, if an incriminating document is found on the computer but attribution

9   is an issue, other documents or files created around that same time may provide

10  circumstantial evidence of the identity of the user that created the incriminating

11  document.

12       65.    Analyzing data has become increasingly time-consuming as the volume of

13  data stored on a typical computer system and available storage devices has become mind-

14  boggling.  For example, a single megabyte of storage space is roughly equivalent of 500

15  double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is

16  roughly equivalent of 500,000 double-spaced pages of text.  Computer hard drives are

17  now being sold for personal computers capable of storing up to 2 terabytes (2,000

18  gigabytes) of data.  And, this data may be stored in a variety of formats or encrypted

19  (several new commercially available operating systems provide for automatic encryption

20  of data upon shutdown of the computer).  The sheer volume of data also has extended the

21  time that it takes to analyze data.  Running keyword searches takes longer and results in

22  more hits that must be individually examined for relevance.   And, once reviewed,

23  relevant data leads to new keywords and new avenues for identifying data subject to

24  seizure pursuant to the warrant.

25       66.    Based on the foregoing, identifying and extracting data subject to seizure

26  pursuant to this warrant may require a range of data analysis techniques, including

27  hashing tools to identify data subject to seizure pursuant to this warrant, and to exclude

28

certain data from analysis, such as known operating system and application files.  The identification and extraction process, accordingly, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within one-hundred twenty (120) days of this warrant, absent further application to this court.

67.     All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

## VII.   CONCLUSION

68.     I further request that the Court authorize execution of the warrant at any time of day or night, as the **TARGET DEVICES** are already in the custody of the DEA.

69.     Based on the foregoing, it is my opinion that there is probable cause to believe that DEALBA and others violated Title 21, United States Code, sections 841, 843(b), and 846, and that the **TARGET DEVICES** will contain evidence and instrumentalities of these violations.  Therefore, I request that the Court issue a warrant authorizing agents to search the **TARGET DEVICES** for the items set forth in Attachment B.

I declare under penalty of perjury that the above is true and correct to the best of my knowledge.

Dated:  April _____, 2019

DEA Special Agent Jaquelyn Garcia

Subscribed and sworn to before me this _10_ day of April, 2019 in San Diego, California.

HON. BARBARA L. MAJOR
United States Magistrate Judge

AFF. IN SUPPORT OF SEARCH WARRANT
(FILED UNDER SEAL)                    25

# EXHIBIT 2

NOT FOR PUBLIC VIEW

AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
Southern District of California

SEALED

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>One (1) Apple iPhone 7 cellular telephone, IMEI<br>355315086746370 | )<br>)<br>)   Case No.   19MJ1472<br>)<br>)<br>) |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Southern_____ District of _____California_____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A incorporated herein by reference

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B incorporated herein by reference

**YOU ARE COMMANDED** to execute this warrant on or before _____April 24, 2019_____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Hon. Barbara L. Major_____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____

Date and time issued:   4/10/19 at 4:09PM          *Barbara J Major*
                                                                  *Judge's signature*

City and state:     San Diego, California          Hon. Barbara L. Major, U.S. Magistrate Judge
                                                                  *Printed name and title*

AO 93 (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

## Certification

     I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

PROPERTY TO BE SEARCHED

The following property is to be searched:

a)      Apple iPhone 7 cellular telephone, IMEI 355315086746370;

b)      an Amazon Fire HD 8 tablet, Model: SX034QT;

c)      Kingston DT50 8GB USB flash drive;

all found and seized on or about February 1, 2019. As described below, the **TARGET DEVICES** were seized from JOANNA DEALBA ("DEALBA") during the execution of a border search at the United States port of entry located in San Ysidro, California. The **TARGET DEVICES** are located at 2255 Neils Bohr Court, San Diego, CA 92154.

## ATTACHMENT B

### ITEMS TO BE SEIZED

Authorization to search the **Target Devices** described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the **Target Devices** for evidence described below. The seizure and search of the **Target Devices** shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the **Target Devices** will be electronic records, communications, and data such as emails, text messages, photographs, audio files, videos, and location data, for the period of October 3, 2018 to January 31, 2019.

a.   tending to identify attempts to import or distribute controlled substances;

b.   tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the distribution or importation of controlled substances;

c.   tending to identify co-conspirators, criminal associates, or others involved in the importation or distribution of controlled substances;

d.   tending to identify travel to or presence at locations involved in the importation or distribution of controlled substances;

e.   tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

f.   tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Section 841, 843(b) and 846.

NOT FOR PUBLIC VIEW

AO 93 (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
### Southern District of California

SEALED

| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. |
| Amazon Fire HD 8 tablet, Model: SX034QT | ) ) ) | 19 MJ 1469 |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Southern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A incorporated herein by reference

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B incorporated herein by reference

**YOU ARE COMMANDED** to execute this warrant on or before _____April 24, 2019_____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Hon. Barbara L. Major_____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*     ☐ until, the facts justifying, the later specific date of _____

Date and time issued: 4/10/19 at 4:07PM          *Judge's signature*

City and state:     San Diego, California          Hon. Barbara L. Major, U.S. Magistrate Judge
                                                    *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

## Return

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

The following property is to be searched:

a)  Apple iPhone 7 cellular telephone, IMEI 355315086746370;

b)  an Amazon Fire HD 8 tablet, Model: SX034QT;

c)  Kingston DT50 8GB USB flash drive;

all found and seized on or about February 1, 2019. As described below, the **TARGET DEVICES** were seized from JOANNA DEALBA ("DEALBA") during the execution of a border search at the United States port of entry located in San Ysidro, California. The **TARGET DEVICES** are located at 2255 Neils Bohr Court, San Diego, CA 92154.

## ATTACHMENT B

## ITEMS TO BE SEIZED

Authorization to search the **Target Devices** described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the **Target Devices** for evidence described below. The seizure and search of the **Target Devices** shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the **Target Devices** will be electronic records, communications, and data such as emails, text messages, photographs, audio files, videos, and location data, for the period of October 3, 2018 to January 31, 2019.

a.   tending to identify attempts to import or distribute controlled substances;

b.   tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the distribution or importation of controlled substances;

c.   tending to identify co-conspirators, criminal associates, or others involved in the importation or distribution of controlled substances;

d.   tending to identify travel to or presence at locations involved in the importation or distribution of controlled substances;

e.   tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

f.   tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Section 841, 843(b) and 846.

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of New York

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>Electronic Devices Currently in the Custody of the<br>Drug Enforcement Administration | )<br>)<br>)<br>)<br>)<br>) |

Case No.    20-M-148

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Eastern_____ District of _____New York_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _____February 27, 2020_____ *(not to exceed 14 days)*
❑ in the daytime 6:00 a.m. to 10:00 p.m.      ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____the Duty Magistrate Judge_____ .
*(United States Magistrate Judge)*

❑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❑ for _____ days *(not to exceed 30)*   ❑ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____

_____
*Judge's signature*

City and state:      _____Brooklyn, New York_____      _____Hon. Lois Bloom            U.S.M.J._____
*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>    20-M-148 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| **Certification** |
|---|

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____          _____
                                                      *Executing officer's signature*

                                       _____

                                                        *Printed name and title*

## **ATTACHMENT A**

The property to be searched is an Apple iPhone cellular telephone bearing IMEI number 355315086746370 ("Device 1") and an Amazon Fire HD 8 Tablet, Model: SX034QT ("Device 2") (collectively the "Devices"), which are in the custody of the Drug Enforcement Administration.

This warrant authorizes the forensic examination of the Devices for the purpose of identifying the electronically stored information described in Attachment B.

## **ATTACHMENT B**

1.      Authorization to search the Devices described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the Devices for evidence described below.

2.      The evidence to be seized from the Devices will be electronic records, communications, and data such as emails, text messages, photographs, audio files, videos, and location data, for the period of October 3, 2018 to January 31, 2019.

      a.   tending to identify attempts to import or distribute controlled substances;

      b.   tending to identify accounts, facilities, storage devices, and/or services – such as email addresses, IP addresses, and phone numbers – used to facilitate the distribution or importation of controlled substances;

      c.   tending to identify co-conspirators, criminal associates, or others involved in the importation or distribution of controlled substances;

      d.   tending to identify travel to or presence at locations involved in the importation or distribution of controlled substances;

      e.   tending to identify the user of, or persons with control over or access to, the Devices; and/or

      f.   tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Section 841, 843(b) and

846.

2